**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ST. PAUL; KAOHLY HER, Mayor of St. Paul, in her official capacity; IRENE KAO, City Attorney of St. Paul, in her official capacity; AXEL HENRY, Chief of Police, St. Paul Police Department, in his official capacity,<br><br>Defendants. | No. 26-4498<br><br>**COMPLAINT** |

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. Federal law prohibits state and local governments from regulating the activities of the Federal Government. *United States v. Washington*, 596 U.S. 832, 838 (2022) (The Supremacy Clause "prohibit[s] state laws that *either* 'regulat[e] the United States directly *or* discriminat[e] against the Federal Government . . . .'"); *Mayo v. United States*, 319 U.S. 441, 445 (1943) (The Supremacy Clause renders "the activities of the Federal Government . . . free from regulation by any state."); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). A state or local law that directly regulates the Federal Government is invalid. *See Mayo*, 319 U.S. at 445.

2. Despite that well-established principle, St. Paul recently enacted two ordinances that purport to do exactly what constitutional law says it cannot: regulate how federal law enforcement officers carry out their official duties in that City.

3. The first, Ordinance 26-6 (hereinafter the "ID Ordinance") purports to require federal law enforcement officers, when "performing Law Enforcement Duties in the city of St. Paul," to "Visibly Display [agency] Identification on the outermost layer of their uniform," with limited exceptions.

4. The second, Ordinance 26-7 (hereinafter the "Face Covering Ordinance") purports to require that no federal law enforcement officer may "wear a Face Covering or Personal Disguise that conceals or obscures their facial identity in the performance of Law Enforcement Duties," except during certain limited types of operations.

6. Boldly, both the ID Ordinance and the Face Covering Ordinance subject federal officers to criminal liability for non-compliance. Specifically, they each provide that any federal law enforcement officer "who willfully and knowingly violates this section is guilty of a misdemeanor and, upon conviction thereof, may be punished by fine, by imprisonment, or both," St. Paul, Minn., Code §§ 268A.01(b)(2), 268B.01(d) (2026), and each violation "on a given day is considered a separate violation." *Id.*

7. The ID and Face Covering Ordinances thus purport to directly regulate federal law enforcement officers by mandating them to comply with municipal uniform and identification requirements and penalizing those officers for complying with federal laws governing their official duties.

8. Members of the St. Paul City Council lauded the Ordinances' targeting of federal officers. Councilwoman Saura Jost said, "It should embarrass the federal government that we have to outline this baseline practice in law for them, but they appear incapable of shame."[1] Councilwoman Cheniqua Johnson stated, "ICE agents should not be able to terrorize our community under the comfort of a mask. Hiding their face shouldn't be an option. Masks off. It's that simple."[2]

9. Courts, however, have uniformly enjoined materially similar state and local laws as unconstitutional direct regulation of the Federal Government. *See United States v. California*, 819 F. Supp. 3d 1109, 1132 (C.D. Cal. 2026) ("*California I*") (enjoining materially similar face covering regulation); *United States v. California*, 173 F.4th 1060, 1068 (9th Cir. 2026) ("*California II*") (enjoining materially similar identification regulation); *United States v. Virginia*, No. 26-0545, 2026 WL 2411521, at *15 (E.D. Va. Aug. 18, 2026); *United States v. City of Philadelphia*, 838 F. Supp. 3d 436, 456 (E.D. Pa. July 2, 2026); *United States v. New York*, No. 1:26-CV-1360(MAD/ML), 2026 WL 2225423, at *25 (N.D.N.Y. Aug. 3, 2026).

10. This Court should join the growing number of others that are putting an end to this type of blatant unconstitutional regulation of the Federal Government and invalidate

---

[1] City of St. Paul, *Saint Paul City Council Adopts ORD 26-6 Requiring Visible Identification for Law Enforcement Officers*, https://www.stpaul.gov/news/saint-paul-city-council-adopts-ord-26-6-requiring-visible-identification-law-enforcement [https://perma.cc/6CPF-PJAM] (last visited Oct. 6, 2026).

[2] City of St. Paul, *Saint Paul City Council Enacts Face Covering Restrictions to Safeguard Residents During Law Enforcement Operations*, https://www.stpaul.gov/news/saint-paul-city-council-enacts-face-covering-restrictions-safeguard-residents-during-law [https://perma.cc/DCN3-WC7X] (last visited Oct. 6, 2026).

and enjoin the Face Covering Ordinance and the ID Ordinance (collectively, the "Challenged Laws").

## JURISDICTION AND VENUE

11. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

12. Venue is proper under 28 U.S.C. § 1391(b)(1) because all defendants reside in this district.

13. The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

14. Plaintiff, the United States of America, enforces federal laws through its Executive agencies. Those agencies include but are not limited to the Department of Justice (DOJ) and its component law enforcement agencies—*e.g.*, the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA)—and the Department of Homeland Security (DHS) and its component law enforcement agencies—*e.g.*, U.S. Immigration and Customs Enforcement (ICE) (which includes Homeland Security Investigations (HSI)) and U.S. Customs and Border Protection (CBP).

15. Defendant City of St. Paul is a municipality within the State of Minnesota.

16. Defendant Kaohly Her is the mayor of St. Paul. Under Chapter 3 of the St. Paul City Charter, the executive power is vested in the mayor. St. Paul, Minn., Code § 3.01. She is charged with ensuring that the "Charter and the laws and ordinances are enforced." *Id.* § 3.01.1. The mayor "shall direct and supervise the administration of all departments,

offices and agencies of the city," which includes the St. Paul Police Department. *Id.* § 3.01.4. Mayor Her signed the Ordinances into law. She is being sued in her official capacity.

17. Defendant Irene Kao is the City Attorney of St. Paul. The City Attorney "represent[s] the city in all causes in which city is interested and [has] full and complete charge of the legal business of the city." *Id.* § 3.02. She also "shall prosecute . . . actions and proceedings by . . . the city and every department and agency thereof," including violations of the Ordinances. *Id.*; *see also id.* § 3.02(8). City Attorney Kao is being sued in her official capacity.

18. Defendant Axel Henry is the Chief of Police of the St. Paul Police Department. The Chief of Police has "general authority and control over all departmental staff and shall oversee the proper fulfillment of all tasks and duties assigned to the department," *id.* § 8.03, which includes the duty to "[p]reserve the public peace, prevent crime, and detect and arrest offenders," *id.* § 8.02(1). He is being sued in his official capacity.

## <u>LEGAL AND FACTUAL BACKGROUND</u>

### FEDERAL LAW ENFORCEMENT

19. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause incorporates principles of intergovernmental immunity, and thus, a state enactment

is invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (citation omitted).

20. The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Subordinate officers in various federal agencies, including DOJ, DHS, and their components, assist the President in discharging that duty. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020); *see also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (stating that the Federal Government "can act only through its officers and agents").

21. Federal law empowers the Executive to provide for and dictate the conduct of federal law enforcement officers in carrying out their official duties. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of DOJ in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of Homeland Security the power to "control, direct[], and supervis[e]" all DHS employees).

22. Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g.*, 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees); 10 U.S.C. § 723(b)(1) (providing

exception to certain identification requirements to individuals who "do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties").

23. Because the Federal Government's authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers "must act within the States." *Tennessee*, 100 U.S. at 263. Accordingly, federal law enforcement officers carry out their duties within the several states and their localities, including the City of St. Paul.

24. For example, the DEA enforces our Nation's controlled substances laws. *See generally* The Controlled Substances Act, *codified as amended at* 21 U.S.C. § 801, *et seq.* In carrying out that mission, the DEA investigates and aids in the prosecution of major violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100–0.101.[3]

25. As another example, the FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. It carries out this mission through numerous operations throughout the country and in partnership with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.85.[4]

---

[3] *See also* DEA, *Mission*, https://www.dea.gov/about/mission [https://perma.cc/Y2FW-H3BV] (last visited Oct. 6, 2026).

[4] *See also* FBI, *Mission and Priorities*, https://www.fbi.gov/about/mission [https://perma.cc/6RUL-NZ2L] (last visited Oct. 6, 2026).

26. DHS, through ICE and CBP, is principally responsible for enforcing our Nation's immigration laws, including the Immigration and Nationality Act (INA), which, pursuant to Congress's power to "establish an uniform Rule of Naturalization," U.S. Const. art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *see Arizona v. United States*, 567 U.S. 387, 395 (2012).

27. The INA confers upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully present in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. As part of those enforcement efforts, DHS, through HSI, also investigates transnational crime and threats, including incidents of human smuggling and human trafficking. *See* 8 U.S.C. §§ 1324, 1232.

## THE ST. PAUL ORDINANCES

### I. The ID Ordinance

28. On February 11, 2026, the City Council of the City of St. Paul adopted the ID Ordinance and codified it in the Code of Ordinances of the City of Saint Paul, Minnesota § 268A. The ID Ordinance was signed by Mayor Kaohly Her the same day and became effective on March 14, 2026. A copy of the ID Ordinance is attached hereto as Exhibit A.

29. The ID Ordinance purports to apply to federal law enforcement officers by defining a "Law enforcement agency" to include "any federal law enforcement agency," St. Paul, Minn., Code § 268A.01(a)(2), and by defining a "Law enforcement officer" as "any person elected, appointed, or employed by a law enforcement agency empowered to detect and apprehend persons violating federal, state, or local laws," *id.* § 268A.01(a)(3).

30. The Ordinance provides that "[a] Law enforcement officer performing law enforcement duties in the city of Saint Paul must visibly display identification on the outermost layer of their uniform." *Id.* § 268A.01(b)(1).

31. "Law enforcement duties" means "law enforcement operations" involving "[p]roactive patrols on foot or in or on a police vehicle;" "[d]etention or arrest of an individual;" or "[d]eployment for crowd control purposes." *Id.* § 268A.01(a)(4).

32. "'Visibly display' means to display in a size and location reasonably visible to a member of the public with whom the Law Enforcement Officer interacts." *Id.* § 268A.01(a)(5).

33. "'Identification' means the name of the law enforcement agency by which such law enforcement officer is employed and either a name or badge number or both name and badge number of the law enforcement officer." *Id.* § 268A.01(a)(1).

34. The ID Ordinance contains limited, vague exceptions:

a. Conducting active undercover operations or investigative activities;
b. Exigent circumstances, involving an imminent danger to persons or property, or the escape of a perpetrator, or the destruction of evidence, including if the law enforcement officer is responding to those circumstances while off-duty;
c. Where there is a specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety of the officer.
d. Complying with applicable laws governing occupational health or safety; or
e. Complying with applicable laws governing reasonable accommodations.

*Id.* § 268A.01(b)(1). Because the exceptions are vague and the ID Ordinance does not establish who determines whether they are met, upon information and belief, that discretion is given to the City of St. Paul.

35. The Ordinance penalizes willful and knowing violations of the ID Ordinance as a misdemeanor punishable by imprisonment, a fine, or both. *Id.* § 268A.01(b)(2). Each violation on a given day is considered a separate violation. *Id.*

**II. The Face Covering Ordinance**

36. One week after adoption of the ID Ordinance, on February 18, 2026, the City Council adopted the Face Covering Ordinance and codified it in the Code of Ordinances of the City of Saint Paul, Minnesota § 268B. The ID Ordinance was signed by Mayor Her on February 20, 2026, and became effective on March 22, 2026. A copy of the Face Covering Ordinance is attached hereto as Exhibit B.

37. The Face Covering Ordinance purports to apply to federal law enforcement officers by defining a "Law enforcement agency" to include "any federal law enforcement agency," St. Paul, Minn., Code § 268B.01(a)(2), and by defining a "Law enforcement officer" as "any officer of a local, state, or federal law enforcement agency, or any person acting on behalf of a local, state, or federal Law Enforcement Agency, empowered with the authority to detect and apprehend persons violating federal, state, or local laws," *id.* § 268B.01(a)(3).

38. The Face Covering Ordinance's definition of "Law enforcement officer" is substantially similar to the same in the ID Ordinance. *Compare id. with id.* § 268A.01(a)(3). The Ordinances' definitions of "Law enforcement agency" and "Law enforcement duties" are identical. *See id.* §§ 268B.01(a)(2), (4); 268A.01(a)(2), (4).

39. The Face Covering Ordinance defines "Face covering" to mean "any opaque mask, garment, helmet, headgear, or other item that conceals or obscures the facial identity

of an individual, including, but not limited to, a balaclava, tactical mask, gaiter mask, ski mask, and any similar type of facial covering or face-shielding item to obscure the effect of an individual's facial features or characteristics." *Id.* § 268B.01(a)(1). A face covering does not include an N95 medical mask, surgical mask, or transparent face shield to protect against transmission of disease or infection or any other mask, helmet, or device, including but not limited to air-purifying respirators, full or half masks, or a self-contained breathing apparatus, necessary to protect against exposure to any toxin, gas, smoke, inclement weather, or any other hazardous or harmful environmental condition." *Id.*

40. "Personal disguise" refers to "any mask, clothing, wig, or item worn with the specific intent to alter a person's appearance to conceal their identity, physical characteristics, or impersonate another." *Id.* § 268B.01(a)(5).

41. The Face Covering Ordinance contains some exceptions. These are limited to the following situations:

1. Conducting active undercover operations;
2. Conducting tactical operations where protective gear is required for physical safety;
3. Utilizing a face covering with eye protection from the use of retinal weapons;
4. Assigned to special weapons and tactics (SWAT) team units, or agency equivalent, while actively performing their SWAT responsibilities.

*Id.* § 268B.01(c)(1). The Face Covering Ordinance contains exceptions that are substantially similar to those in the ID Ordinance. *Compare id*. *with id.* § 268A.01(b)(1). Because the exceptions are vague and the Face Covering Ordinance does not establish who determines whether they are met, upon information and belief, that discretion is given to the City of St. Paul.

42. The Ordinance penalizes willful and knowing violations of the Face Covering Ordinance as a misdemeanor punishable by imprisonment, a fine, or both. *Id.* § 268B.01(d). Each violation on a given day is considered a separate violation. *Id. Compare id. with id.* § 268A.01(b)(2).

**<u>THE ID AND FACE COVERING ORDINANCES ARE UNLAWFUL</u>**

43. The Challenged Laws expressly apply to federal law enforcement officers and regulate the manner in which they may perform their official duties. The Ordinances dictate when and how federal officers must display identification and whether they may use facial coverings, while subjecting officers to misdemeanor penalties for noncompliance. Such requirements directly regulate the Federal Government in the performance of governmental functions and are invalid under the Supremacy Clause. *See California I*, 819 F. Supp. at 1132 (enjoining materially similar face covering regulation); *California II*, 173 F.4th at 1068 (enjoining materially similar identification regulation); *Virginia*, 2026 WL 2411521, at *11; *Philadelphia*, 838 F. Supp. 3d at 456; *New York*, 2026 WL 2225423, at *25.

44. The constitutional defect does not depend on whether St. Paul's requirements materially interfere with a particular operation, whether existing federal identification and facial-covering practices are indispensable in every circumstance, or whether the Ordinances may also apply to State or local officers. Nor is there a de minimis exception to the doctrine of intergovernmental immunity. *California II*, 173 F.4th at 1067. Because the Ordinances directly regulate the conduct of the United States, they are "void irrespective of whether the regulated activities are essential to federal functions or

operations, and irrespective of the degree to which [they] interfere[] with federal functions or operations." *Id*.

45. Due to the nature of law enforcement operations, federal law enforcement officers require flexibility to determine when to announce their identities. For example, CBP and ICE have discretion as to when they permit their officers and agents to wear facial coverings, whether to add or remove individual identifiers, and what identification is provided to members of the public upon request.[5] That is up to the federal agencies and officers based on the facts and circumstances in a particular case and cannot be subjected to bright-line or conflicting rules made by state or local governments. Removing this flexibility and requiring federal agencies and officers to comply with stricter St. Paul requirements would undermine officer safety and operational effectiveness.

46. The Ordinances accordingly prevent effective federal law enforcement within St. Paul and constitute unlawful direct regulation of the Federal Government.

## THE ID AND FACE COVERING ORDINANCES HARM THE FEDERAL GOVERNMENT AND THE PUBLIC

47. The United States suffers a sovereign and irreparable injury from the ID and Face Covering Ordinances, *cf. Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022); *Vermont. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000); *California II*, 173 F.4th at 1069 ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."); *United States*

[5] For instance, federal regulations provide that "an immigration officer who is authorized to execute an arrest" announce himself and the purpose of the arrest "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii).

*v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) ("The United States has standing to seek relief from actual or threatened interference with the performance of its proper governmental functions."). The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to St. Paul (or any municipality) by complying with the City's purported requirements for federal law enforcement officers.

48. Even beyond the sovereign injury, compliance with the ID and Face Covering Ordinances would endanger officers and reduce operational effectiveness by, among other things, subjecting them to standards that conflict with and differ materially from applicable federal standards and policies.

49. Federal law enforcement agents and officers cannot and will not comply with the challenged ID and Face Covering Ordinances, which are unconstitutional and recklessly disregard officer safety, public safety, and federal operational needs.

50. Law enforcement historically has been a dangerous job but now is even more so. Protecting the personal identities of federal officers and by extension their families is necessary in part due to the increasing threats of targeted harassment and retaliation against federal officers and agents for simply doing their jobs enforcing the laws enacted by Congress. While such threats have always existed, the volatile political environment has increased such threats exponentially, requiring new tactics to mitigate the harms to officer safety and operational effectiveness.

51. For instance, members of the public photograph, film, and publish federal enforcement actions online and include the personal identities of federal officers for the

sole purpose of intimidation and harassment. This content is directly used by members of organized crime and transnational criminal organizations in serious and potentially deadly ways.

52. For example, some individuals photograph officers' faces and run them through facial recognition applications that search social media and doxxing sites such as, for example, ICESpy.org. Once a match is made, these individuals search for family members, including children, and disseminate this information online, allowing people to track, harass, and obstruct law enforcement. This opens officers up to harassment, tracking, and assaults in the performance of their duties in the field.

53. Federal agents around the country and in Minnesota particularly have recently been targeted for harm. Between January 2025 and March 2026, ICE Office of Professional Responsibility (OPR) investigated 39 cases of doxxing and/or threats to ICE employees in Minnesota alone. These 39 Minnesota incidents—36 doxxing incidents and 3 threats—represented approximately 28% of all doxxing/threat ICE OPR investigations nationwide.

54. Examples of substantiated doxxing events in Minnesota from January 2026 to the present include the following:

a. On January 4, 2026, an online social media user publicly disclosed that approximately 75 ICE officers were staying at a specific hotel in Minnesota, their length of stay, method of travel, payment method used at the hotel, demographic information, and vehicle and luggage descriptions.

b. On January 18, 2026, another social media user posted a threatening message targeting ICE Enforcement and Removal Operations Minneapolis Deportation Officers (ERO DO). The user posted, “Polymarket bets have it at 95% and hopefully [the Officers] will get Babbitted and Kirked soon.”

c. On or about January 23, 2026, OPR received a referral from DHS Office of Inspector General (OIG) regarding a civilian complaint that yet another social media user posted an ERO DO’s residential address, telephone number, vehicle license plate, email address, and family information. The user posted, “JD Vance stated that the shooter has absolute immunity regarding the murder of Renee Good. He may have immunity, but at least he will no longer have privacy.” The DO confirmed that his personal information has been publicly disseminated, and members of the public have attempted to contact him and his family. The ERO DO was based in Minneapolis.

d. On January 27, 2026, an ICE Forensic Document Examiner (FDE) reported that a user had posted his name, position, photo, and city on the “icelist,” a public online database. The FDE also discovered that his date of birth, two phone numbers, address, and a link to his Linkedin profile had been posted on a different social media website.

e. On January 29, 2026, an HSI Special Agent (SA) working out of Hennepin County reported that his Personally Identifiable Information (PII) was posted on a social media platform. The post included a screenshot of his public social media account, photos of him, and his personal phone number linked to a

real estate broker business. According to the SA, he received harassing phone calls and derogatory comments on his social media account, was called a "nazi," and was told that his children should be taken away from him because ICE is separating families.

f. On May 11, 2026, a DO in St. Paul reported being doxxed after conducting a court-ordered detainee release. His photograph was posted on a social media platform along with information related to his employment with ICE. Subsequently, multiple users promoted violence toward him and his family.

g. From approximately January through June 2026, DHS and ICE operations in Minnesota, including activities at or near the Bishop Henry Whipple Federal Building in Minneapolis, were affected by organized efforts to impede, intimidate, or interfere with federal immigration enforcement duties. These efforts reportedly involved coordinated planning, communications, meetings, trainings, fundraising, surveillance of federal vehicles, rapid response activity, blockades, confrontations, and the use of vehicles, trailers, debris, shields, and other obstacles to obstruct law enforcement operations.

h. From April 10 through June 17, 2026, 32 ICE employees in the Minneapolis-St. Paul area experienced a total of 60 documented incidents in which they were followed, surveilled, recorded, photographed, or harassed by unknown individuals while departing or traveling to and from the Bishop Henry Whipple Federal Building and other work-related locations. Several employees reported experiencing more than one such incident during this period.

55. Separate from the OPR investigative data discussed above, between FY 2023–FY 2024 and FY 2025–FY September 2026, HSI data reflects that the total number of reported threats increased from 217 to 3,465; death threats increased from 16 to 2,967; threats of assault increased from 8 to 277; and threats of intimidation increased from 193 to 221.

56. The targeting of federal agents is not limited to DHS. FBI Special Agents around the country, including those assigned to the Minneapolis field office, have been targeted for harm, including harassment, assault, and murder. For example, earlier this year, FBI agents were forced to abandon their vehicles when a crowd of protestors rushed a group of federal law enforcement agents while they were attempting to investigate a crime scene. The crowd subsequently vandalized the vehicles, and while doing so they located FBI materials within the vehicles that contained the PII of many FBI Minneapolis employees and posted this information online. Many FBI Minneapolis employees received threats as a result. During this incident, the crowd stole some of the agents' personal items, including their driver's licenses, which resulted in threats both to the agents and to their extended families. These threats have continued, necessitating the need for FBI protection measures that included relocating one of the affected agents to a new field office.

57. In June 2025, a user on a social network posted the image of a DEA SA assisting in the execution of a search warrant with the caption, "Trying to identify any of these FBI, Homeland Security, and ATF goons who invaded a Minneapolis community to kidnap and terrorize its members." Another user followed with a post identifying the SA

by name and title and citing the use of multiple facial recognition models to match the image in question to the agent's picture on another site.

58. Facial coverings can prevent agitators from identifying and tracking officers, especially those using facial recognition or other tools. And while officers almost always wear tags identifying them as federal officers (apart from, for example, surveillance, undercover, or plainclothes operations), personal identifiers carry similar risks that can allow agitators to identify and harass individual officers. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal histories or gang affiliations, transnational criminal organizations, and known or suspected terrorists.

59. Facial coverings and removal or modification of personal identifiers could also prevent suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, flexibility to use uniform modifications is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. Websites that enable the widespread dissemination of officers' identities, *see, e.g.*, *supra* ¶ 52, can also undermine undercover operations and plainclothes missions.

60. Finally, the threat of enforcement for noncompliance potentially creates a chilling effect on federal law enforcement. Even though the Federal Government has made clear that it does not intend to comply with the Challenged Laws, individual officers might

be chilled because they face the threat of potential imprisonment, citations, and other significant penalties for taking actions that are consistent with federal law and policy.

61. Moreover, enforcement is certainly impending: The ID and Face Covering Ordinances have already taken effect; the challenged provisions plainly apply to federal law enforcement officers and carry penalties for noncompliance; numerous federal officers and agents operating within St. Paul are engaged or are likely to engage in the very conduct the ID and Face Covering Ordinances proscribe; and members of the City Council have indicated their intent to enforce its provisions against them.

62. The ID and Face Covering Ordinances also harm public safety because obstructing federal enforcement risks leaving dangerous individuals at large in St. Paul and compromising undercover or other investigative operations that protect the broader community against gangs and trafficking organizations.

63. Bystanders near enforcement actions also face added risk when officers' identities are compelled to be disclosed in real time. More broadly, the public has an independent interest in the Federal Government's ability to carry out its enforcement functions without obstruction by St. Paul's ID and Face Covering Ordinances.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE SUPREMACY CLAUSE
### ST. PAUL CODE OF ORDINANCES § 268A
### (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

64. Plaintiff hereby incorporates paragraphs 1 through 63 of the Complaint as if fully stated herein.

65. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

66. The Supremacy Clause incorporates principles of intergovernmental immunity, and thus, a state or local law is invalid if it "regulat[es] the United States directly *or* discriminat[es] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)); *California I*, 819 F. Supp. at 1132; *California II*, 173 F.4th at 1067; *Virginia*, 2026 WL 2411521, at *9; *Philadelphia*, 838 F. Supp. 3d at 456; *New York*, 2026 WL 2225423, at *6.

67. The ID Ordinance purports to require federal law enforcement officers to display visible identification while performing their duties in St. Paul and subjects those officers to penalties for noncompliance.

68. St. Paul's enforcement of the ID Ordinance against federal law enforcement officers constitutes unlawful regulation of the Federal Government.

69. Accordingly, St. Paul Code of Ordinances § 268A is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

**COUNT II**
**VIOLATION OF THE SUPREMACY CLAUSE**
**ST. PAUL CODE OF ORDINANCES § 268B**
**(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**

70. Plaintiff hereby incorporates paragraphs 1 through 69 of the Complaint as if fully stated herein.

71. The Face Covering Ordinance purports to prohibit federal law enforcement officers from wearing a face covering or personal disguise that conceals or obscures their facial identity in the performance of law enforcement duties.

72. St. Paul's enforcement of the Face Covering Ordinance against federal law enforcement officers constitutes unlawful regulation of the Federal Government.

73. Accordingly, St. Paul Code of Ordinances § 268B is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

A. That this Court enter a judgment declaring that St. Paul Code of Ordinances § 268A violates the Supremacy Clause and is therefore invalid as to federal law enforcement officers;

B. That this Court preliminarily and permanently enjoin Defendants, as well as their successors, agents, servants, employees and attorneys, and all those working in concert with them, from enforcing St. Paul Code of Ordinances § 268A or any similar regulation against federal law enforcement officers;

C. That this Court enter a judgment declaring that St. Paul Code of Ordinances

§ 268B violates the Supremacy Clause and is therefore invalid as to federal law enforcement officers;

D. That this Court preliminarily and permanently enjoin Defendants, as well as their successors, agents, servants, employees and attorneys, and all those working in concert with them, from enforcing St. Paul Code of Ordinances § 268B or any similar regulation against federal law enforcement officers;

E. That this Court award the United States its costs and fees in this action; and

F. That this Court award any other relief it deems just and proper.

Dated: October 15, 2026

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney
District of Minnesota

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CODY M. POPLIN
Deputy Assistant Attorney General
Civil Division
Enforcement & Affirmative Litigation Branch

HILARY K. PERKINS
Director
Enforcement & Affirmative Litigation Branch

JACQUELINE COLEMAN SNEAD
Deputy Director, Affirmative Litigation Section

*_/s/ Luke A. Miller_*____________________________
LUKE A. MILLER
MN Bar No. 0504247
Trial Attorney
Enforcement & Affirmative Litigation Branch
Civil Division, U.S. Department of Justice
450 Fifth Street, N.W., Ste. 6400 South
Washington, D.C. 20001
(202) 598-7479
Luke.Miller2@usdoj.gov

*Attorneys for the United States of America*